Exhibit 1

1

```
1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF TENNESSEE
2                     AT NASHVILLE

3

4   ALEXANDER L. BAXTER,          )
                                  )
5       Plaintiff,                )
                                  ) Case No. 3:15-cv-19
6   VS.                           ) JUDGE FRIEDMAN
                                  ) MAGISTRATE JUDGE FRENSELY
7   SPENCER HARRIS, et al,        )
                                  )
8       Defendants.               )
    _____X
9

10

11

12

13  _____

14

15          DEPOSITION OF ALEXANDER L. BAXTER

16            TAKEN ON SEPTEMBER 13, 2017

17

18  _____

19

20

21

22

23  Prepared by:
    Carole K. Briggs, LCR #345
    Briggs & Associates
24  222 Second Avenue, North, Suite 360M
    Nashville, Tennessee  37201
25  Briggscourtreporting@hotmail.com
```

1                              APPEARANCES:

2

3

4     FOR THE PLAINTIFF:

5

6     ALEXANDER BAXTER, *PRO SE*
      TDOC #145056
7     140 Macon Way
      Hartsville, Tennessee 37074
8

9

      FOR THE DEFENDANTS:
10

11

      MELISSA ROBERGE, ESQUIRE
12    Metropolitan Department of Law
      P.O. Box 196300
13    Nashville, Tennessee  37219-6300

14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS

<u>Witness</u>                                                    <u>Page</u>


ALEXANDER L. BAXTER

      Examination by Ms. Roberge                    5



## LIST OF EXHIBITS

<u>Number</u>      <u>Description</u>                          <u>Page</u>


1               hand-drawn diagram by deponent    57

1                    S T I P U L A T I O N

2

3

4          The deposition of Alexander Baxter, taken on

5    behalf of the defendants, at the Trousdale Correctional

6    Center, 140 Macon Way, Hartsville, Tennessee, on

7    September 13, 2017, for all purposes allowed under the

8    Federal Rules of Civil Procedure.

9          It is agreed that Carole K. Briggs, licensed

10   court reporter for the State of Tennessee, may swear the

11   witness, take his deposition, and afterwards reduce same

12   to typewritten form, and that the reading and signing of

13   the completed deposition by the witness is not waived.

14          All formalities as to notice, caption,

15   certificate, et cetera, are expressly waived. All

16   objections, except as to the form of the question, are

17   reserved to the hearing.

18

19   (Unless previously provided, all names are spelled
     phonetically, to the best of the court reporter's
20   ability.)

21

22

23

24

25

```
 1              (Whereupon, the foregoing deposition
 2              began at 10:50 a.m.)
 3    Whereupon,
 4                   ALEXANDER L. BAXTER,
 5    having been first duly sworn, was examined and deposed
 6    as follows:
 7    EXAMINATION BY MS. ROBERGE:
 8         Q.    Good morning, Mr. Baxter.  As I stated
 9    before, I am Melissa Roberge, and I am representing
10    Officers Spencer Harris and Brad Bracey in the lawsuit
11    you brought against them.  Can you hear me okay?
12         A.    Yes.
13         Q.    For the benefit of our court reporter, if you
14    could speak up a little bit so that she's able to hear
15    all of your testimony.
16         A.    Yes.
17         Q.    Thank you, sir.  And you've done a great job
18    so far of giving verbal responses to my questions.
19    Because we do have a court reporter here taking
20    everything down, if you can continue to do so that will
21    make the transcript easier for us to read.
22         A.    Yes.
23         Q.    Also, do you understand that your testimony
24    here today is under oath?
25         A.    Yes, I do.
```

1     Q.   And if I ask you a question and you answer

2   the question, I am going to assume that you have

3   understood my question.  Is that fair?

4     A.   Yes.

5     Q.   And if you don't understand my question,

6   please ask me to either re-ask it or to rephrase it.

7   Does that sound fair?

8     A.   That's fair.

9     Q.   This is just sort of my opportunity to get to

10  know your side of the story.

11     A.   Okay.

12     Q.   We'll start with some basics and some

13  background about you before moving on to the events of

14  January 8, 2014.  What is your date of birth?

15     A.   █████████████████

16     Q.   And what is the highest grade that you have

17  completed?

18     A.   Twelfth grade.

19     Q.   And did you receive a high school diploma?

20     A.   Yes.

21     Q.   Where was that from?

22     A.   North Nashville High School.

23     Q.   And you're currently housed at a TDOC

24  correctional facility; is that correct?

25     A.   This dump here, yes.

1     Q.    Prior to being here, where did you live at?

2     A.    I was homeless.

3     Q.    Would you stay in any shelters?

4     A.    I stayed on the street and in shelters, with

5 a family member here and there when they would put up

6 with me.

7     Q.    And were those family members located in

8 Nashville?

9     A.    Yes.

10     Q.    Can you tell me their names, please?

11     A.    I don't want to get them involved in this.

12 The only family members I want involved in this are the

13 ones who helped me when the situation occurred.

14     Q.    We'll talk about those family members, but

15 for my purposes, you've asked for a jury in this case.

16 So --

17     A.    Yes.

18     Q.    One of the things that we may want to do is

19 ask people who are going to be members of the jury if

20 they know you or are any of your family members.  I do

21 need their names.  It doesn't necessarily mean they'll

22 be involved in this.

23     A.    Once again, I don't want to get them

24 involved.  When I get in front of the jury, I will be

25 more than happy to tell them.

1       Q.    Mr. Baxter, I don't want to get contentious

2  with you.  If I need to stop this to call the judge and

3  direct him to have you answer, I'm happy to do that.

4       A.    That's fine.

5       Q.    It sounds like I will need a list of things

6  to potentially talk to the judge about.

7       A.    I'm not here to be confrontational.  And you

8  know, actually there's a motion pending to stay

9  discovery.  I don't understand why this is going on

10  anyway until that motion is ruled upon.

11      Q.    Until the motion is ruled upon, discovery is

12  not stayed.

13      A.    Okay.  I understand.

14      Q.    Sure.  Have you ever had a permanent address,

15  Mr. Baxter?

16      A.    Yes.

17      Q.    When was that?

18      A.    Oh, when I was going to school in high

19  school.

20      Q.    And since that time you have not had a

21  permanent address?

22      A.    Well, yeah, I've stayed here and there, you

23  know, the best I could.

24      Q.    Is that all in the Nashville area?

25      A.    Yes, most of the time.  Yes.

```
1        Q.    Where else have you lived?

2        A.    I've lived in Knoxville, Tennessee.  That's

3   it.

4        Q.    During what time period did you live in

5   Knoxville?

6        A.    Oh, back in the '80s.

7        Q.    And are you married, Mr. Baxter?

8        A.    No.

9        Q.    Have you ever been married?

10       A.    No.

11       Q.    Before this most recent incarceration, did

12   you have a steady girlfriend?

13       A.    No.

14       Q.    Do you have any children?

15       A.    Yes.

16       Q.    Can you please tell me their names?

17       A.    You're going to have to get an order from the

18   judge in order for me to get my children involved.  Do

19   you understand that you're representing two crooked

20   cops?  Does that matter to you?

21       Q.    Mr. Baxter, this is my deposition and so I

22   get to ask the questions.  So thank you, though.

23             Let's talk about your job history.  Since

24   2007, have you had a job?

25       A.    I've been locked up most of the time.  I did
```

1    work at the Sounds stadium.

2         Q.    What did you do there?

3         A.    Pretty much everything, mostly concessions.

4         Q.    And when was that?

5         A.    It was 2013.

6         Q.    And would that have just been during the

7    summer months of 2013?

8         A.    Yes.

9         Q.    Any other employment that you can recall?

10        A.    No, not recently, no.

11        Q.    How much were you making at the Sounds

12   stadium?

13        A.    Minimum wage.

14        Q.    And you referenced being locked up.  Let's

15   talk a little bit about your criminal history.  What

16   charges are you currently serving time on?

17        A.    Theft of property.

18        Q.    And how long is your sentence?

19        A.    Twelve-year sentence.

20        Q.    Are you expected to serve 100 percent of that

21   sentence?

22        A.    No.

23        Q.    Are you expecting to serve 30 percent of that

24   sentence?

25        A.    No.

1       Q.    What percentage of the sentence do you expect

2  to serve?

3       A.    With my history, I'm not for certain.

4       Q.    When were you convicted on those charges?

5       A.    I'm not sure of the date.  I guess 2014.

6       Q.    And what about, sir, before that, what -- do

7  you remember what period of time you were incarcerated

8  before you had gotten locked up on those charges in

9  2014?

10      A.    You sent me a package that had my entire

11  history.  So I'm going to refer to that package.

12      Q.    Okay.  Have you ever been arrested for

13  anything that did not result in a conviction?

14      A.    Oh, yeah.  I can't recall though.

15      Q.    Have you ever been arrested outside of

16  Tennessee?

17      A.    Yes.

18      Q.    What other states have you been arrested in?

19      A.    I'm going to refer to the package that you

20  sent me.  There's a whole bunch of stuff.

21      Q.    I didn't recall information outside of

22  Tennessee being in there.

23      A.    Well, with all due respect, you're welcome to

24  go back and review that information.

25      Q.    Let's turn to the incident of January 8th,

1  2014.

2      A.    Yes.

3      Q.    At that time you were homeless?

4      A.    Yes, I was.

5      Q.    The night before that, had you stayed at a

6  shelter or anywhere?

7      A.    No, I stayed -- I was out on the street.

8  Listen, Ms. Roberge, for the past two previous nights, I

9  had stayed out in the cold.  And during that particular

10  time, it was freezing bitter cold.  I remember that day

11  on the 8th -- the night before I had gone to Vanderbilt

12  emergency room.  They'll arrest you.  So I just went in

13  there to suck up a little heat.  And I was standing in a

14  little shed behind one of those music companies on Music

15  Row.  And I couldn't sleep.  I didn't have anything to

16  drink, no liquor to help me stay warm, and so I got

17  moving.  I hurt so bad.  That morning -- I could tell

18  you what happened that morning.  I walked downtown.  And

19  I went to this place called -- on Second Avenue, the

20  Metro Action Commission, and asked them for some help.

21      Q.    This was the morning of January 8th?

22      A.    Yes.   Well, the Metro Action Commission can

23  help people like me, but they sent me to this office

24  right across the hall in the same building and they gave

25  me a case worker, everything.  They gave me some food

1    they had stored back there.  I believe it was some of

2    their personal food.  They gave me something to eat and

3    let me sit there for two or three hours and then, you

4    know, I had to leave.

5        Q.    Do you recall the name of the case worker?

6        A.    No, ma'am.  It was a lady.  It was a white

7    lady.  She was a real nice lady.  She did what she

8    could.

9        Q.    Do you recall the name of the office?

10      A.    No, but it's in the same building.  If you

11    walk into the entrance of the building, you go to the

12    right, it's the Metro Action Commission, and go to the

13    left, it's that place there, whatever that place is.

14    They help people.

15       Q.    Do you recall what time you left?

16       A.    No, I don't.

17       Q.    Was it before noon or after noon?

18       A.    I don't recall.

19       Q.    After you left there, where did you go?

20       A.    I walked back over to Music Row where I was

21    -- had been staying, but the people were there at work.

22       Q.    So you referenced you walked back to where

23    you had been staying.  Is this the sort of shed that you

24    had talked about previously?

25       A.    Yeah.

1    Q.    So that's a shed that is behind some of the

2  buildings.  Did you know the people who owned the shed?

3    A.    No.

4    Q.    Did the people who owned the shed know you

5  were there?

6    A.    No.

7    Q.    Did you have any personal belongings that

8  were in the shed?

9    A.    No.  A few empty liquor bottles, and I found

10  a quilt, that's it.  That's all I remember having.  I

11  had left one of my little bags that I tote with me

12  there.

13    Q.    And was all of that there when you returned?

14    A.    Yeah.

15    Q.    And about how long did you stay there?

16    A.    Okay, you mean how long had I been there?

17    Q.    Yeah, how long had you been staying there?

18    A.    Oh, off and on, I had been going through

19  there for a couple of months.  At nighttime there wasn't

20  nobody there.

21    Q.    Was the shed on the property of like a

22  private residence house or was it a business?

23    A.    No, it was one of those little places where

24  they record music.  I got it in my mind, but... Heck,

25  I've seen it on T.V.  I have.  The little place.

1   Q. What street is it on?

2   A. It's on 16th Avenue, South.  Not very far

3 from where all of this mess happened.

4   Q. And so let's kind of turn to the mess that

5 happened.  I have the address as being -- or one of the

6 addresses as being on Portland Avenue.  Does that sound

7 correct?

8   A. Yes, ma'am.  Yes.

9   Q. Tell me where you were immediately before you

10 went to Portland Avenue?

11   A. Walking around, looking for something, you

12 know.

13   Q. Do you recall what you were wearing?

14   A. No, I don't.

15   Q. And the Portland Avenue, that's in the

16 Belmont/Hillsboro area of Nashville; is that correct?

17   A. Yes.

18   Q. And at some point, you entered a house there;

19 is that correct?

20   A. Yes.

21   Q. And was that your home?

22   A. No.

23   Q. And tell me why you entered that house?

24   A. Well, I had a couple of guys who would give

25 me money for stuff like video games or a laptop

1   computer, and when I got those things, I would get me a

2   little hotel room or something.

3       Q.   Just so the record is clear, the guys who

4   would give you money for laptops or video games, they

5   weren't in that house?

6       A.   No.

7       Q.   So you went in the house to get something to

8   be able to give to those guys?

9       A.   Yes.  But my thing was not to break into

10   something.  It was like college students and they always

11   leave stuff unlocked.  I kind of had the sense -- I

12   walked through there and so much cars in the driveway,

13   so I kind of just guessed nobody was there.  I tried the

14   back door.

15       Q.   And if it was open you would go in?

16       A.   Yeah, grab a few things and run back out as

17   fast as I could.  And that's the truth.

18       Q.   Had you been drinking that day?

19       A.   A little bit.  Well, I was going to, but I

20   got caught with the bottle.

21       Q.   Before you entered this house on Portland

22   Avenue, had you been drinking at all that day?

23       A.   No, I was frozen.  I was hurting.  My feet

24   were hurting.  My feet felt like two bricks, two blocks.

25   I remember how bad I was hurting to find something.  You

1  know, what I was really looking for is like over there

2  in that area, when people move out, people will leave

3  the doors unlocked and the electricity will still be on.

4  So many times I found somewhere to sleep, to stay warm.

5  It was getting close to getting dark, so I needed a

6  place to stay.

7      Q.    And had you taken any drugs that day?

8      A.    No.

9      Q.    Do you recall prior to that day when the last

10  time was that you had taken any drugs?

11     A.    I don't recall.

12     Q.    During that time, were you a drug user?

13     A.    Yes.

14     Q.    And what drugs would you take?

15     A.    Cocaine.

16     Q.    And how frequently would you take cocaine?

17     A.    Not very often.  When I would get a little

18  extra money to buy it.

19     Q.    And what do you recall taking from that house

20  on Portland Avenue?

21     A.    Let me at this point right here, I'm going to

22  start objecting to the questions because they're totally

23  irrelevant to this guy sicking that dog on me.  That's

24  what he did.

25     Q.    Our court reporter will note the objections

1  for the record.

2      A.    Yes.

3      Q.    So is this house on Portland Avenue, that was

4  one that you sort of ran into, grabbed some things and

5  then ran back out; is that correct?

6      A.    That's correct.

7      Q.    Do you know if anybody was home?

8      A.    No.

9      Q.    Was it daylight out when you --

10     A.    Yes.  And all of these questions I'm entering

11  objections to, saying that they're irrelevant.  They

12  don't have anything to do whatsoever with what those

13  officers did in that basement.  Nothing.

14     Q.    Okay, we'll get there, I promise.  Did you

15  enter any cars around that area before you left Portland

16  Avenue?

17     A.    You know, I don't know if Portland was the

18  first one or the second one, I am not really sure, but I

19  did go into a car.  Because what I'll do is I'll look

20  for change in the console.  And they charged me with

21  stealing the car.  I just looked for some change.  You

22  know how they just put every charge in the world on me,

23  whether you did it or not.  They don't care.

24     Q.    Did you plead guilty to those charges?

25     A.    I don't remember.  I was charged-- no, I just

1    pled guilty to theft of property, that I remember.  I

2    could be wrong.  I'm pretty sure just theft of property.

3         Q.    After you left Portland Avenue, is that when

4    you went to Fairfax Avenue?

5         A.    Is that the second place?

6         Q.    I believe so.

7         A.    Fairfax is that the place where they sicked

8    the dog on me, or was that the house?  That's where they

9    put the dog on me, correct?

10        Q.    Do you have an independent recollection?  The

11   records reflect that it was Fairfax Avenue, a house on

12   Fairfax Avenue.

13        A.    Yeah.  Well, the places I had gone in, I

14   really thought was empty.  And when I got in there, I

15   saw furniture.  And so I went looking for some change

16   over the refrigerator.  And I got something, there was a

17   bottle of liquor and some car keys, so I got the car

18   keys.  I left out.  I went to the car.  I pushed the

19   little thing and it made some noise and so I went

20   looking for change.  That's when I saw the police coming

21   and the helicopter.

22        Q.    You saw the police coming?  You saw the

23   helicopter?

24        A.    Yes.

25        Q.    How many helicopters did you see?

1       A.    One.  We were standing there looking at each

2   other.  I was standing there.  They was up there.

3       Q.    Did you hear any police sirens?

4       A.    No.

5       Q.    Did you see any police cars?

6       A.    Yes.

7       Q.    How many police cars did you see?

8       A.    I saw one.  Then I ran.

9       Q.    Do you know what officers were in that police

10  car?

11      A.    I have no idea.  You got some stuff coming

12  too.  I'm asking all of that.

13      Q.    And then you started running?

14      A.    (Nodding head.)

15      Q.    How far did you run?

16      A.    It was to the house where I went into the

17  basement at.  I knew that because I had been there

18  before.

19      Q.    How many times had you been there?

20      A.    Oh, four or five times.

21      Q.    About how far away is that?  About how far

22  away is it, two blocks, a mile?

23      A.    Half a block.  It was right behind the place

24  that I had come out of.

25      Q.    And when you saw the helicopter, did you

1  assume that they were there chasing you?

2      A.    Not at first.

3      Q.    So why did you start running?

4      A.    Because I saw the police car.

5      Q.    Even if they weren't there for you, you just

6  thought --

7      A.    Okay, I don't understand your question.

8      Q.    That's okay.  So when you saw the helicopter,

9  you didn't think the helicopter was there looking for

10  you; is that correct?

11      A.    Not at first.

12      Q.    What about when you saw the patrol car, did

13  you think --

14      A.    I figured it out then.

15      Q.    So you went to this home where the basement

16  was.  Can you describe the window into the basement?

17  Does it sit below ground?

18      A.    Well, it's not below ground, but it's a

19  basement window.  It's a great big house where college

20  students stay.  And like the front is like several

21  windows.  I would go in the back and push it in and just

22  jump down in it.  It's not real, real cold -- I mean

23  it's not real, real warm, but it keeps you alive, you

24  know.

25      Q.    Do you know if anybody was home at that time?

1    A.    I don't think so because usually I could hear
2    -- you know, like if I sleep at night down there, I
3    could hear.
4        Q.    So you had been in that home before when
5    there had been people there?
6        A.    Yes.
7        Q.    And so can you get into the window from
8    ground level?
9        A.    Yes.
10       Q.    And once you enter the window then you drop
11   down?
12       A.    Yes.
13       Q.    And the window was not locked?
14       A.    No.
15       Q.    And did you go in there to hide from the
16   police?
17       A.    Yes.
18       Q.    Did you know they were following you at that
19   point?
20       A.    Yes.  The helicopter was right up -- I
21   couldn't shake them.
22       Q.    Did the helicopter have a spotlight on you?
23       A.    It was broad daylight.  Snow on the ground,
24   ice everywhere.  I don't even think it was above
25   freezing that day.  It was so cold.  I get shivers just

1  thinking about it.

2      Q.    When you entered through the window, did you

3  know where the closest police officer was?

4      A.    I don't know.  I don't understand that

5  question.

6      Q.    Sure.  When you went in through the window

7  could you see a police officer?

8      A.    I didn't think they were looking for me.

9      Q.    I'm just trying to figure out how close they

10  were to you.

11     A.    They were pretty close because on the

12  opposite side of the house I ran.  And the police zipped

13  by on the street so I ran around the front to this side

14  of the house.  That's when I went in.

15     Q.    At that point, did you think you were going

16  to get caught?

17     A.    I was hoping I wouldn't, but it was pretty

18  bad.  It looked pretty bad.

19     Q.    Did the basement have any lights?

20     A.    You know, I don't know.  Yeah, it did, but I

21  didn't use them.  I didn't want to get detected.

22     Q.    Did you have a flashlight with you?

23     A.    No.

24     Q.    What did you have with you?

25     A.    I think I had a little screwdriver or some

1  sort -- some type of tool to pry a window open with or
2  something.
3      Q.   If we can take a quick break I need to ask
4  the guards something.
5           (Recess observed.)
6  BY MS. ROBERGE:
7      Q.   Mr. Baxter, I had taken a quick break because
8  I wanted to make sure it was okay that I pass you this
9  piece of paper and a pen.  If you could, could you draw
10 sort of the layout of the basement for me?  If you could
11 label it?
12     A.   Okay, I jumped in.  This is the front of the
13 house.  That's the street you're talking about right
14 there.  I ran.  The police car came this way, I ran this
15 way.  Because he's gone by so I ran around to the front
16 of the house.  Wait a minute.  Hold on, I'm saying it
17 wrong -- yeah, yeah, that's right.  I ran around the
18 front.  I went in this way.  I went in this way.  Then
19 when I jumped in, I ran over this way to this side,
20 tried to look out the window but I could hear the police
21 radio, so I ducked down.
22     Q.   Where those three Xs are, are those to
23 indicate windows?
24     A.   Yes.
25     Q.   Can you write windows on them?

1    A.    I got it right here.  You sent it.

2    Q.    And is that square that you drew sort of

3   inside the rectangle, is that the water heater?

4    A.    It's the water heater right there and a

5   chimney right there and I get warm right here.  So I

6   would lean up against this right here.

7    Q.    Okay.

8    A.    When I ran in, I ran this way.  I jumped, and

9   I ran over here trying to look out these windows right

10  here.  But I could hear the police radio, so I ducked

11  down and ran over here and sit up against this right

12  here.

13   Q.    Can you circle the window that you entered

14  through.

15   A.    (Witness complies.)  That's the back of the

16  house.

17   Q.    Sure.  What was in the basement other than

18  the chimney and the water heater that we've talked

19  about?  Were there boxes?

20   A.    It was empty.  It was pretty dark down there.

21  But there were a few things down there that they store,

22  but most of it was dirt.  Dirt on the floor, dirt on the

23  ground.

24   Q.    You said it was pretty dark in there?

25   A.    Yes.  Well, not that dark.  I mean because

1  there was light shining in.  It was daylight.  Most of

2  the time I had been there was at nighttime.  That's what

3  I'm thinking about.  But that particular time it was

4  during the day.  I usually won't go in a place like that

5  during the day unless I'm trying to take something.

6      Q.    Could you stand up straight in the basement?

7      A.    I think so, yes.  I could be wrong.  My

8  answer is I don't recall precisely, but I ran from here

9  from the window over across to the other side, yes.

10     Q.    And you're a pretty tall guy, right, about

11 6'2"?

12     A.    Yeah.  You know, obviously you're asking

13 these questions to try to punch holes.  I'm just telling

14 you the truth.  If you came here to find the truth,

15 that's what you're going to get.  If you're looking to

16 try to punch holes or something, that's a bunch of,

17 excuse my language, bullshit.  Just like I said

18 happened; nothing different.  Now, so you can stop

19 asking questions, I'm just going to tell you what

20 happened.  When I ran, I jumped in right here, I ran

21 over here so I was trying to look out the window, and I

22 remember ducking down.  And I could finally hear a

23 police radio and I ran over here and I sat, right.  And

24 I refused to move and I was shivering, I was hurting.

25     Q.    When you say you sat, you sat in between the

1    square which denotes a chimney, and then the circle

2    which denotes the water heater; is that correct?

3         A.    Yes.

4         Q.    Okay.  Would you be visible from either the

5    window that you entered or the window that is directly

6    across from it, would you have been visible?

7         A.    I think so.

8         Q.    Why do you think that?

9         A.    Well, because they knew I was in there.

10        Q.    It's a little different than if somebody was

11   looking in either of those windows, so either --

12        A.    I saw a cop right here at this window,

13   rubbing the window and looking in.

14        Q.    Okay.  So you saw --

15        A.    Whether I was visible or not, I don't know.

16        Q.    Okay.  So you saw a police officer.  Can you

17   circle that window also and write police officer.  Can

18   you write police officer on it so we don't get confused.

19   So once you had gotten behind or in between the chimney

20   and the water heater, when did you first hear a police

21   officer's voice?  About how much time passed?

22        A.    They had the house surrounded.  The

23   helicopter I think saw me go in there, or somebody saw

24   me.

25        Q.    So there were police officer voices all

1    around?

2         A.    Yes.

3         Q.    And you said -- did the police officer who

4    was at the window that we've circled, did that police

5    officer ever call into the basement?

6         A.    Uh, not him, no.

7         Q.    And was that police officer, to your

8    knowledge, either Officer Harris or Officer Bracey?

9         A.    I have no idea.  I couldn't tell.  I was

10   terrified.  I was frightened.  Everything had happened

11   so fast, you know, it was almost a relief to go to jail.

12        Q.    And is the police officer that you saw at the

13   window the same police officer who eventually entered

14   the basement?

15        A.    I couldn't tell who the officer was.  All I

16   know is, I saw a head and I figured it was a police

17   officer.

18        Q.    Okay.  At any point while you were in between

19   the chimney and the water heater, did you hear a police

20   officer give you a command to surrender?

21        A.    I sure did.  My answer is yes, I did.

22        Q.    And you did not heed that command, correct?

23        A.    Did I get up and walk to them, no.

24        Q.    Did you continue to remain hidden?

25        A.    I sat there, yes.

1     Q.   Did you call out to them or say anything to

2  the police officers?

3     A.   No, I did not.

4     Q.   Did you hear anyone enter the basement?

5     A.   Yes, I heard them all when they came into the

6  basement, right here.  They came in where I came in.

7  The dog came in first.  I could hear the dog.  The dog

8  ran right where I ran, over this way up toward this way.

9  The police officers came in this way.  And they came

10  from right here and that's when I was like this.

11  Because they had me (indicating with arms up).  One got

12  in front of me and one behind me.  The dog came and ran

13  up to the police officer.

14     Q.   Okay.  I'm going to try to just break that

15  down for the record because it's going to be hard to

16  understand later.  I understand what you're saying now,

17  but later I am not going to be face to face with you.

18  Okay.  So the police officers who ultimately entered the

19  basement, how many were there?

20     A.   I didn't know, but there were two of them.  I

21  didn't know how many at that time.  But I heard them

22  when they all came in.  They all came in just, boom

23  boom, I heard the whole thing.

24     Q.   From where you were sitting, you could not

25  see that window that you entered into; is that correct?

1     A.    No, I couldn't.

2     Q.    Did you hear those officers give any warning

3 about a canine being released?

4     A.    I did hear that, yes.

5     Q.    Do you recall specifically what they said?

6     A.    No, I don't.

7     Q.    Once they told you that the canine would be

8 released, did you surrender?

9     A.    What do you mean?

10    Q.    When they called from the window --

11    A.    Did I get up and walk to them, no, I did not.

12    Q.    So then you heard the canine enter; is that

13 correct?

14    A.    Yes.

15    Q.    And then you --

16    A.    Actually, that's not even an issue because

17 that's not what I'm complaining about.

18    Q.    I understand, sir.

19    A.    And -- well, go ahead.

20    Q.    Thank you.  So you heard the canine enter and

21 you heard the canine run towards -- follow the same path

22 that you had followed which is to the window directly

23 across; is that correct?

24    A.    Yes.  And then it was running around back

25 barking like this, on the other side.  I'm sitting there

1   and I'm looking at the dog running around like this,

2   woof, woof, woof, woof, woof, woof.  And at this point

3   I'm like oh, my God.  Then the officers came this way.

4        Q.    Again, just for purposes of the record, what

5   you are describing to me is after the canine ran across

6   the basement to the window, directly across, it ran back

7   and forth and you could see the dog running back and

8   forth?

9        A.    I could see the dog, yes.

10       Q.    Okay.  And then the police officers came in,

11  and at that point there were two police officers, to

12  your knowledge?

13       A.    Yes.

14       Q.    Okay.  The police officers came in.  And they

15  went to -- towards the chimney and the water heater; is

16  that correct?

17       A.    The side of the house I am talking about is

18  over here.  They came this way.  In other words, let's

19  see here, all of them came in right here.  The dog went

20  that way and the police officers came this way.

21       Q.    To your knowledge, did both police officers

22  go that way?

23       A.    Yes.

24       Q.    And to your knowledge, they were together?

25       A.    Yes.

1     Q.   Did they give any warnings as they were

2  walking towards the water heater?

3     A.   No.  Put your hands up.  I had my hands up.

4     Q.   And at that point were you sitting on our

5  bottom?

6     A.   I was sitting on my butt with my hands up in

7  the air.

8     Q.   Okay.  Can you describe what the police

9  officer -- I'm sorry.  So the police officers came up

10  and to you as you're in between the water heater and the

11  chimney.  Did they have their guns out?

12     A.   Well, I remember seeing a gun and a flash-

13  light.

14     Q.   Do you know if they both had their guns out?

15     A.   I don't know.  Look, look, look, obviously

16  what you're trying to go with this is looking for -- you

17  know, I'm telling you what happened, right.  Now,

18  whether they had one shoe in front of the other or left

19  arm was longer than the right arm, all of that mess, I

20  am not sure.  All I know is what they did.

21     Q.   And we're getting there, Mr. Baxter.

22     A.   So my answer to that question is that I don't

23  know.

24     Q.   Okay.  Did both officers continue to stand in

25  front of you?

1      A.    No, one was behind me.

2      Q.    Okay.  So --

3      A.    Right behind me.  Like by that wall right

4 there.

5      Q.    Do you know which officer was behind you?

6      A.    I learned.  I didn't know at the time what

7 their names were.  But from the responses that you all

8 sent me, that's how I figured out who is who.

9      Q.    Which officer was behind you?

10     A.    Bracey.

11     Q.    Okay.  And Officer Bracey went behind you?

12     A.    Yes.

13     Q.    Okay.

14     A.    Harris was in front of me.

15     Q.    When Officer Bracey went behind you, did he

16 go sort of around the chimney, or did he walk right past

17 you?

18     A.    He was like right directly behind me.

19     Q.    So on this picture you've shown me where you

20 would be sitting?

21     A.    I was sitting more like -- I was right there.

22 So both of them came in this way, one got in front of me

23 and one was like right here.

24     Q.    Can you -- let's see.  On the circle, the

25 little circle that you've drawn, can you write "me" to

1  reflect you.

2         A.    (Witness complies.)  For the record, I don't

3  know if this is exact, but pretty much it is.

4         Q.    Perfect.  And then if you can draw two other

5  dots and mark one with "SH" for where Spencer Harris was

6  standing and the other "BB" for Brad Bracey.

7         A.    (Witness complies.)

8         Q.    And what was the dog -- was the dog

9  continuing to run up and down?

10        A.    It all happened so fast.  The dog ran, came

11 this way to this officer right here.

12        Q.    Did the dog have a leash on?

13        A.    Yeah, because he had him by the leash.  He

14 had him by the collar or something.

15        Q.    Did he have it by the leash or by the collar?

16        A.    The leash is a long chain thing though.  He

17 had him by the collar and he was rearing up like this.

18        Q.    Do you know what type of dog it was?

19        A.    It was a German Shepherd.  It was slobbering

20 at the mouth and everything.

21        Q.    So when the dog came up to Officer Harris,

22 Officer Harris grabbed him by the collar; is that

23 correct?

24        A.    Yes.

25        Q.    What do you recall the officer saying?

1      A.   He kept saying show me your hands, show me

2  your hands.  Hell, I had my hands up.  That's when I

3  knew something wasn't quite right.

4      Q.   How did you know that?

5      A.   Because he could see me plainly and he kept

6  saying show me your hands.  He had the dog -- like

7  you're the officer, this is about from here to where we

8  were.  He said show me your hands.  I'm like, you know.

9      Q.   Did he give you any other directives?

10     A.   No.

11     Q.   Were you still sitting at this time?

12     A.   Yes, I never moved.

13     Q.   What happened next?

14     A.   He let the dog go.

15     Q.   Did he give you any warning that he was going

16  to let the dog go?

17     A.   No, he just let it go.

18     Q.   Did he tell Officer Bracey that he was going

19  to let the dog go?

20     A.   No.

21     Q.   Did Officer Bracey say anything while you all

22  were standing there?

23     A.   Not that I recall.

24     Q.   Did you say anything to the officers?

25     A.   I was screaming at the top of my lungs.  The

1    dog was ripping me up.

2         Q.    How much time elapsed between when Officer

3    Harris had the dog by the collar and when he released

4    the dog?

5         A.    Oh, it couldn't have been five or ten

6    seconds, something like that.

7         Q.    And so the dog, Officer Harris released the

8    dog?

9         A.    (Nodding head.)

10        Q.    Where did the dog first bite you?

11        A.    It just lunged and caught me right there

12   (indicating).  Just kept --

13        Q.    And --

14        A.    Where's the medical reports?

15        Q.    Just for the record, Mr. Baxter is reflecting

16   his left arm pit area where the dog first bit him and

17   then he made motions to simulate multiple bites; is that

18   fair?

19        A.    That's fair.

20        Q.    And Officer Bracey was behind you; is that

21   correct?

22        A.    (Nodding head.)

23        Q.    And in your lawsuit you said that Officer

24   Bracey failed to intervene; is that correct?

25        A.    That's correct.

1     Q.    What could Officer Bracey have done?

2     A.    Well, you know, he could have -- you know, as

3 the Sixth Circuit said, that he had an opportunity, and

4 he could have instructed the other officer to pull the

5 dog off.  He could have attempted, he could have done

6 something.  That's the reason I wasn't so much mad at

7 Bracey until I got his police report that said it was a

8 canine apprehension.  It was not a canine apprehension.

9 He let that dog go deliberately and he knew what he was

10 doing, and he let the dog stay on me for quite a bit of

11 time.

12     Q.    So your criticism of Officer Bracey is after

13 Harris had released the dog?

14     A.    Right.  I don't think he knew.  Well,

15 actually, you know, because as I was standing there, I

16 could see, you know, kind of -- I can't say one hundred

17 percent certain.  I am pretty sure there was some eye

18 contact, and he had a sense that he was going to let the

19 dog go.

20     Q.    Is the fact that they made eye contact the

21 only --

22     A.    I don't know.  I can't say that for certain.

23 All I know is there was time, there was reflection.

24 There was time for them to understand one another that

25 -- you know, this is Harris, you're Harris, this is

1  Bracey and I'm fixing to do this.  This creep, he done

2  broke into this house, and I'm going to let him have it.

3      Q.    Did Officer Harris ever say that?

4      A.    No, of course not.

5      Q.    Did Officer Bracey ever encourage Officer

6  Harris to release the dog?

7      A.    No.

8      Q.    I think you said they didn't say anything?

9      A.    Other than show me your hands.  Hell, my

10  hands were already up.

11     Q.    Okay.  I think you stated that there was

12  about five to ten seconds between when the dog came up

13  and Officer Harris had him by the collar and he released

14  the dog?

15     A.    Right.  At one point he had almost pulled the

16  dog off his feet. The dog was wanting at me so bad.  I

17  remember that because all I could see was his teeth, you

18  know.

19     Q.    Do you have any knowledge about if a canine

20  dog will respond to anybody other than their handler?

21     A.    No.  I didn't know who was the handler or

22  not.  You know, at the time I had no clue about who the

23  dog was trained by, you know.

24     Q.    But you have no knowledge on if a dog will

25  only respond to the person who they are trained by?  No

1    knowledge?

2         A.    No.

3         Q.    Thank you.  How many times did the canine

4    bite you?

5         A.    Oh, when it got a hold of me, it kept shaking

6    his head like this (indicating).  It was hurting so bad

7    that I finally managed -- it just took his breath and

8    got a hold of me again, like two or three times.

9         Q.    So the dog made two or three sort of

10   separate, I am going to call them, contact points?

11        A.    Yeah, because you know, I was like being

12   shook around like a rag doll while he had me by his

13   teeth.

14        Q.    Each time that he sort of made these contact

15   points, these two or three times, did his teeth pierce

16   the skin?

17        A.    Yes.

18        Q.    And were each of the contact points in your

19   arm pit area?

20        A.    Look, you want me to take my shirt off?

21        Q.    That's not necessary, but thank you.  But so

22   each -- were each of the contact points in your arm pit

23   area?

24        A.    Yes.

25        Q.    And were you bleeding from these bites?

1     A.    Of course.

2     Q.    Can you describe the amount of blood?

3     A.    No, I don't.  You know, everything was

4 happening so fast.  No, I can't.

5     Q.    Were you wearing a shirt at the time?

6     A.    Yes.  It bit through -- I was wearing several

7 shirts and sweaters.  It bit through all of that.

8     Q.    Had it torn?  Had he bit through them so

9 often that the sleeve was falling off?

10    A.    No, it was up under here.

11    Q.    Did the blood from these bites soak through

12 your shirts?

13    A.    I think so.  I don't have the shirts.

14    Q.    After the dog had been released did you

15 notice blood coming through your shirts?

16    A.    Ma'am, after the dog had been released those

17 officers were on me.  I thought I was going to die.  I

18 thought they were going to let the dog kill me.  I

19 really did.  And I was just so -- I couldn't -- they had

20 to pick me up and carry me to the window, push me, and

21 push me through the window to the officers outside.

22    Q.    How long was the dog biting you?

23    A.    Oh, heck, I don't know.  A long time.  Long

24 enough for me to be hollering and screaming, stop, stop,

25 you know.

1      Q.    Did it last more than a minute?

2      A.    Somewhere around in there.  It was quite a

3 long time.  It was a long time.  It felt like a long

4 time.

5      Q.    It felt like a long time?

6      A.    Yes.

7      Q.    But you don't have any independent

8 recollection of exactly how long it was; is that

9 correct?

10     A.    It was a long time.  That's my answer.

11     Q.    When the dog -- so when the dog stopped

12 biting you, what officer got the dog to stop biting you?

13     A.    The officer that was in front of me, Harris,

14 he finally reached in and pulled the dog away.

15     Q.    So officer Harris had to actually physically

16 reach in and pull the dog off of you?

17     A.    Yes.

18     Q.    Did you ever hear him give a command to the

19 dog to stop biting?

20     A.    No.

21     Q.    With the amount of pain that you were in and

22 sort of the trauma of the whole situation, would you

23 have heard if he had done that?

24     A.    You know, you attorneys have a way of really

25 twisting things around.  But if you were sitting on the

1  ground and a dog attacked you, and I asked you a

2  question like that, what would you think?

3       Q.    That I was doing my job.

4       A.    We got any more questions?

5       Q.    We do.  And I think the question that was on

6  the table was, given sort of the trauma of the entire

7  situation --

8       A.    I'm going to object from this point.  I've

9  given you plenty of information for you to go by.  My

10 answer is I object.

11      Q.    You have to answer the questions.

12      A.    And my answer is I object.

13      Q.    Are you planning on objecting to all of the

14 outstanding questions?

15      A.    If you keep asking me silly questions and

16 questions designed so you can just try to find some

17 little, I don't know, scratch of hope for these officers

18 for what they did to me, yes, my answer is, I object.

19 Because it does not make sense, Ms. Roberge.

20      Q.    Mr. Baxter, as you are probably aware since

21 you have been very diligent with your court filings, I

22 believe in our first case management order the Court

23 cautioned that if you refused to participate in

24 discovery, that one of the sanctions could potentially

25 be dismissal.  Am I to understand that you are refusing

1  to --

2       A.    I've been answering your questions.  I am not

3  refusing.  I have answered 30 or 40 questions.  So

4  that's not a refusal.  But I am entitled to object.

5       Q.    You are entitled to object in a deposition.

6  You are allowed to object to the question, but then you

7  still must answer the question.  So if you would like to

8  object and then give your answer, I am happy to proceed

9  that way.

10      A.    Okay, let's do that then.

11      Q.    So back to the question which is because of

12 the trauma of the entire situation, is it possible that

13 you would not have heard a command?

14      A.    And my answer is I object.  And I don't

15 recall.  These are all leading questions.  You know, and

16 they're not fair to me.  They're not fair to me because

17 of what they did, right.  And you all want to mitigate

18 what they did.  I understand you have a job to represent

19 them, but at some point, you know, your own personal

20 morals should take over and realize what they did.  I

21 know I was wrong.  I've been punished.  I'm in prison.

22 I've been here for almost four years now and got more

23 time to serve.  I didn't hurt anybody.  I didn't destroy

24 any property.  The few little items I did take, they

25 were given back, you know.

1          Now, it should turn to a question of these

2     officers.  You know, are they free to make victims of

3     others?  Are you defending that?  I want an answer to

4     that.  Because that lets me know where you are.

5          Q.    Mr. Baxter, after Officer Harris--

6          A.    I want an answer to my question.

7          Q.    That's not how this works, Mr. Baxter.

8          A.    Who says that you make the rules?

9          Q.    I've not made the rules.  The federal courts

10    have made the rules and I am abiding by those rules.

11         A.    You don't pay attention to the rules.

12         Q.    By bringing a lawsuit-- excuse me, sir.

13         A.    How could you sit there and defend what they

14    did?

15         Q.    Excuse me, sir.  I still have more questions.

16         A.    Go ahead.  Go ahead.

17         Q.    Once Officer Harris had the dog, what

18    happened?

19         A.    Are you getting a transcript of all of this?

20         Q.    If you want to pay for it, you may get a

21    transcript.

22         A.    You mean to tell me that you can take all of

23    this and use it against me any kind of way you can twist

24    it, right, but I don't even get a copy of this?

25         Q.    You may get a copy if you are able to pay the

1   court reporter.

2       A.    Of course I am not able to pay for this.  I

3   am in prison.

4       Q.    Then you may petition the Court and ask --

5       A.    You're not gonna give me a copy of this?

6       Q.    Sir, I am not obligated to give you a copy of

7   this.

8       A.    You all are full of it.  You know that?

9       Q.    Sir, after Officer Harris had taken the dog,

10  what happened next?

11      A.    They got on me.  The officer behind me got on

12  me to arrest me.  Now, whether he lifted my shoe off or

13  took my hat off or any specifics, I don't recall.

14      Q.    Did Officer Bracey --

15      A.    I'm traumatized.  I'm terrified.  So I don't

16  recall exactly what happened.  That's my answer.

17      Q.    Do you recall if it was Officer Bracey who

18  placed you in handcuffs?

19      A.    I don't recall.  I believe it was, yes.

20      Q.    After they got you out of the basement, did

21  you speak to any other Metro police officers?

22      A.    Yeah, a detective came.

23      Q.    Do you recall that conversation with the

24  detective?

25      A.    You sent the tape of it, you should remember.

1    Which, by the way, I don't have.  They kept it.  They

2    won't give it to me.  So it's no good.  So I have to

3    petition the Court to get a copy of that.

4        Q.    Do you have an independent recollection of

5    that conversation?

6        A.    He asked me what happened.  I told him.

7        Q.    Any other specifics about that conversation?

8        A.    He asked me what happened and I told him.

9        Q.    Did you leave the scene in an ambulance?

10       A.    Yes.

11       Q.    And you went to General Hospital; is that

12   correct?

13       A.    Yeah, they passed right by Vanderbilt.  Ain't

14   that something.  Sent me across town to Meharry.

15       Q.    How did the doctors and nurses treat you at

16   Meharry?

17       A.    I don't know.  You might want to ask them.

18       Q.    How did you feel like they treated you?

19       A.    They treated me like I needed emergency

20   treatment.

21       Q.    Do you have any reason to believe that they

22   wouldn't accurately document the injuries that they

23   observed?

24       A.    I don't understand that question.

25       Q.    Is it your understanding that the doctors and

1   nurses that saw you are required to fill out a medical

2   chart when they treat you?

3        A.    I have no idea.  I have no medical training.

4        Q.    Are you aware that Nashville General has

5   generated records, or do you believe --

6        A.    If they have, why haven't you given them to

7   me?

8        Q.    Mr. Baxter, I have them right here to give

9   them to you today.

10       A.    Thank you.

11       Q.    You're welcome.

12       A.    Now we're getting somewhere.  You know, Ms.

13  Roberge, just between you and I off the record, I don't

14  mean -- I'm not here to be confrontational.  I hope you

15  don't leave with a bad impression of me.  When I sat

16  here this evening and I told you, I said I'm going to

17  tell you the truth, and that's what I've done.

18       Q.    I appreciate that, Mr. Baxter, thank you.  So

19  as we had just mentioned, I'm going to double-check with

20  the guards and then I will pass you these medical

21  records.  These medical records are from Nashville

22  General Hospital.  So you understand that medical

23  records are generated when you receive treatment at a

24  hospital?

25       A.    Yes.

1    Q.    Okay.

2    A.    Now, when I got to the jail, they took

3    pictures, and as I received daily chronic care, they

4    took -- my wounds were open.  They took pictures and

5    uploaded them onto their computers.  They said they were

6    required to do this because of perhaps future

7    litigation.  Those are the pictures that will show you

8    and show the Court and the jury exactly the extent of my

9    injuries.  And those are the pictures that I've asked

10   for in discovery and I'm entitled to them.

11   Q.    So going back to the Nashville General

12   records and the individuals who treated you there, do

13   you have any reason to believe that they would have lied

14   in the medical records?

15   A.    I don't know where you're going with this.

16   And so obviously you're looking for something to try to

17   mitigate what these officers did.  I have no reason why

18   you're asking me that.  But my answer to that is, it's

19   not just Metro General.  It's the overall medical

20   records.  I received chronic care for quite a long time.

21   Q.    I understand.

22   A.    So you can't just extract fragments of the

23   pictures.  You got to show the big picture.

24   Q.    I agree with you, Mr. Baxter, but --

25   A.    You can't grab a snapshot.

1     Q.   I agree, but in this moment, I want to talk

2  about a little piece before talking about the big

3  picture.

4     A.   Okay.

5     Q.   So do you have any reason to believe that the

6  individuals who treated you at Nashville General--

7     A.   I have no idea why you're asking me that.

8  Why are you asking me that question?

9     Q.   Mr. Baxter, you are not entitled to know

10  that, but you are required to answer my question.

11     A.   I am entitled to know that.  It is my case.

12     Q.   It is your case but the reason I ask

13  questions is my attorney work product, and I am entitled

14  to keep that confidential.

15     A.   Once you get it, let me see it.  How about

16  that?  That's my answer.  Now call the judge and tell

17  him that.  That's my answer.  I'm through with that.

18     Q.   Do you have any reason to believe that any

19  medical care provider would have lied about the

20  injuries?

21     A.   Now, I can answer that, no.  No.

22     Q.   Did you require stitches?

23     A.   No.

24     Q.   Did you require any surgery?

25     A.   No, they let me go.

1    Q.    Do you know what a puncture wound is?

2    A.    It's serious bodily injury.

3    Q.    Do you understand that a puncture wound is

4    when a sharp object such as a dog's tooth has actually

5    broken the skin?

6    A.    Yes, I understand that is some serious bodily

7    injury as defined by the law.

8    Q.    And how many puncture wounds did you have?

9    A.    Well, you know, I didn't really count at the

10   time.  But like I said, I can take my shirt off and you

11   can see.

12   Q.    No thank you.

13   A.    I have permanent scars.

14   Q.    Have you subsequently counted how many

15   puncture wounds you have?

16   A.    What does that matter?  Why does that really

17   matter?  I mean, but did I count how many times he bit

18   me, no, not at the time.

19   Q.    Since that time have you counted how many

20   times he bit you?

21   A.    Well, you know, you can't answer that by just

22   a definitive answer because he had a hold of me and he

23   was shaking his head like this (indicating).  So if you

24   call each shake a bite, perhaps.

25   Q.    So you have counted how many times he shook

1　his head?

2　　A.　No, of course not.  You know, I'm going to

3　enter an objection again to this.  And I've already

4　answered the question several times but you keep

5　badgering me about answering the same questions, and I'm

6　definitely going to write to the judge about all of

7　this.

8　　Q.　Did you break any bones as a result of the

9　canine bite?

10　　A.　You've got the medical report.

11　　Q.　I'm asking you if you recall breaking any

12　bones from the dog bite?

13　　A.　No.

14　　Q.　All right, Mr. Baxter, I want to turn to the

15　damages that you've requested in this case.

16　　A.　Yes.

17　　Q.　In your verified complaint, you asked for a

18　$100,000 in compensatory damages.

19　　A.　Yes.

20　　Q.　Does that sound correct?

21　　A.　Yes.

22　　Q.　Tell me how you came to that number.

23　　A.　It should have been more.

24　　Q.　Okay.  But I'm asking how did you decide on

25　$100,000?  Tell me what makes up that $100,000.

1    A.    Mental anguish, personal humiliation,

2 emotional distress, serious bodily injury.  How can you

3 put a price on serious bodily injury?  So you're asking

4 me a question that I can't answer.

5    Q.    I'm going to try to break those down.  So

6 mental anguish.  We talked about at the time it was

7 pretty traumatic; is that correct?

8    A.    Yes, it was.

9    Q.    Do you suffer from flashbacks?

10    A.    Oh, yeah, I still see that dog.

11    Q.    How often?

12    A.    About once every three or four or five

13 months, something like that.

14    Q.    Does anything trigger those flashbacks?

15    A.    No, it happens in my sleep.  When I read this

16 stuff right here.  I see the response to the mess you

17 all sent me, which by the way, the prison is on lock-

18 down again and so I have to do all of this work sitting

19 on my prison bed with no legal books.  I can't afford

20 this stuff.  So that's your advantage, I guess.

21    Q.    And you talk about personal humiliation?

22    A.    Yeah.

23    Q.    What do you mean by that?  How were you

24 humiliated?

25    A.    If you -- somewhere in your life picked up

1    something that didn't belong to you and a police officer

2    walks up and pulls a gun and shoots you, right, wouldn't

3    you be humiliated?  So that's my answer.

4         Q.    So as I understand--

5         A.    It's called excessive force.

6         Q.    So you are humiliated because you got caught

7    stealing--

8         A.    Because of excessive force, not because I got

9    caught.

10        Q.    Does any of your past criminal history, are

11   you embarrassed by your past criminal history at all?

12        A.    Yes, I am ashamed.  I'm very ashamed.  Very

13   ashamed.

14        Q.    Have you ever sought mental treatment, Mr.

15   Baxter?

16        A.    I'm receiving mental health treatment right

17   now.

18        Q.    You're receiving it here in the prison?

19        A.    Yes.

20        Q.    In any of your previous incarcerations, have

21   you received mental health treatment?

22        A.    Yes.

23        Q.    In all of them?

24        A.    No, not all of them.  I don't think all of

25   them, no. I don't always tell them, you know.

1       Q.    Have you ever been placed on suicide watch

2   while you were here in this prison?

3       A.    No.

4       Q.    Do you receive any sort of anti-depressants

5   or anti-psychotics?

6       A.    Yes.

7       Q.    What medicines are those?

8       A.    I don't know.  I know one of them is Zoloft.

9   And something else, I don't know.

10      Q.    Have you ever been -- to your knowledge have

11  you ever been diagnosed with a mental illness?

12      A.    I don't recall.

13      Q.    Do you currently have full range of motion of

14  your arm?

15      A.    Well, yeah, but -- yeah, yes, I do.

16      Q.    And also in your complaint you say you want

17  your hospital bill paid for; is that correct?

18      A.    Yes.

19      Q.    How much did you pay for your hospital bill?

20      A.    Ma'am, Meharry, what they do is they send you

21  a bill and they'll stay after you until you pay it.

22  They'll find you somehow.

23      Q.    Have they sent you a bill?

24      A.    No, that's because the address that I gave

25  them was my old home address.  That's probably where it

1    went to.

2         Q.    What was that old home address?

3         A.    4905 Vista View Drive.

4         Q.    Do you know the current resident of that

5    address?

6         A.    No.

7         Q.    When did you live there?

8         A.    Most of my life.  Well, since I was born.

9    Going up through school and all.

10        Q.    That was your parents' house?

11        A.    Yes.

12        Q.    Or your mom's house?

13        A.    Yes.

14        Q.    Since you've been incarcerated since this

15   incident, have you had to pay for any of the medical

16   treatment that you've received?

17        A.    Ma'am, I have not had any money to pay for

18   anything.

19        Q.    Have you needed medical treatment that you

20   have not gotten related to the dog bite?

21        A.    I think that I'm going to need treatment for

22   the rest of my life.

23        Q.    Are you?  Why do you believe that?

24        A.    Because I still have flashbacks, thinking

25   that I'm just going to die.

1    Q.    So you're going to need mental health

2  treatment for the rest of your life?  And I'm

3  distinguishing that from sort of treatment for the

4  physical dog bite.

5    A.    Yes, I'm asking for mental health treatment

6  for the rest of my life.

7    Q.    Okay.  Do you need any medical treatment

8  related specifically to the dog bite?

9    A.    If there is any kind of way to get rid of all

10  this scar tissue, yes.

11    Q.    In a couple of your documents you say that

12  there were no bites on your legs or anywhere else.  Why

13  is that important?

14    A.    (Holding arms up.)  They call it a canine

15  apprehension if a dog is sicking against you, do you

16  think he'll just bite you right here?  What does that

17  tell you?

18    Q.    Do you know anything about Metro Nashville's

19  police department sort of policies on what type of forms

20  they have to fill out and when they have to fill those

21  forms out?

22    A.    No, ma'am.

23    Q.    Do you know if canine dogs are trained to

24  bite and hold?

25    A.    I have no idea.

1   Q.   One of the letters attached to your complaint

2   mentioned an Eddie Maze.  Who is that?

3   A.   He was my lawyer at the time.  I got rid of

4   him.  He was a piece of doodie.

5   Q.   Who was Brian Griffith?

6   A.   He was my attorney that they appointed after

7   the doodie.

8   Q.   Did he represent you in the criminal matter?

9   A.   Yes.

10   MS. ROBERGE:  Ms. Carole, if we can make this

11   the first numbered exhibit.

12   (Exhibit 1 was marked.)

13   BY MS. ROBERGE:

14   Q.   Mr. Baxter, do you recall receiving this

15   document?

16   A.   Yes, I do.

17   Q.   To date, I have not received any responses

18   from you.

19   A.   Well, actually, you did.  And let me ask you

20   a question.

21   Q.   I received a letter but I never received

22   formal responses.  So I would like to go through this

23   document with you to ask any questions that may not have

24   already been covered.

25   A.   I get that.

1    Q.    Other than Alexander Baxter, have you ever--

2    A.    Do you recall receiving that document?  That

3    was my response.  I wanted to see if you would respond

4    to just one.  So I gave you the response.  I sent the

5    response to your response.  I asked one question just to

6    see what happened and you never did.

7    Q.    Other than Alexander Baxter, have you ever

8    been known by any other nicknames or aliases?

9    A.    Well, yeah.  I got arrested and gave fake

10   names before, yes.  So to get back to your last

11   question, when you sent me that discovery request, I did

12   respond and you never did respond.

13   Q.    So you responded by sending your own created

14   medical release; is that correct?

15   A.    Well, the one that you all sent was so broad

16   I mean, heck, it could have covered the day I was born.

17   Totally unrelated to this case.

18   Q.    I understand.  Again, so the record reflects,

19   you stated that you responded to discovery, you did not

20   answer the questions that were asked.

21   A.    I responded with the letter.  I responded

22   with an authorization releasing my medical records to

23   you all.  That's the answer to my question.  And then --

24   Q.    Mr. Baxter?

25   A.    -- and responded again by filling out and

1  signing the medical release that you all sent me.  So I

2  did respond.

3       Q.    Other than responding with the medical

4  releases, though, you've never answered the questions

5  that were contained --

6       A.    I've already answered the questions.

7       Q.    What fake names have you used?

8       A.    I don't recall.

9       Q.    Other than Officer Bracey, Officer Harris, do

10 you know of any other individuals that have knowledge of

11 this claim?

12      A.    What do you mean?  I don't understand that

13 question.

14      Q.    Okay.  So earlier in the deposition when you

15 said you didn't want to get your family involved except

16 for your family who knew about this --

17      A.    Because they're concerned about me.

18      Q.    Okay.  Did they observe your injuries?

19      A.    When they came to the jail I showed it to

20 them.

21      Q.    And who were those individuals?

22      A.    My mother, my brother.

23      Q.    And what are their names?

24      A.    My mother's name is Dorothy Baxter.  My

25 brother's name is Sergeant Antonio Baxter.

1      Q.    Is your brother a police officer or in the

2   military?

3      A.    He's in the military.

4      Q.    What branch?

5      A.    Air Force.

6      Q.    I have a cousin who flies fighter jets for

7   the Air Force.  Probably my favorite branch.

8      A.    We found some common ground.  We've been

9   bumping heads since we've been here.  Anything else we

10  can agree on?

11     Q.    I don't think so but we can try.

12     A.    Some more coming, huh.

13     Q.    With regards to your mother, Dorothy Baxter,

14  is the only extent of her knowledge just  --

15     A.    No, what happened is, they saw it on the news

16  and they went on social media and they saw -- it was

17  posted, people were posting it on social media because

18  the house was surrounded by people.  Especially when the

19  canine officer police got there.  So my brother has a

20  bunch of stuff, I don't know what it is.  But he's

21  saying hell, you know, let me know and I'll send it to

22  you.

23     Q.    So when you say that your brother has a bunch

24  of stuff--

25     A.    I don't know what it is.

1    Q.    You don't know what it is.  Have you asked

2    him for it?

3    A.    Sure.

4    Q.    And he has not given it to you yet?

5    A.    Have I asked him or can I or will I?

6    Q.    I'm asking have you?

7    A.    No, I just told him that I am going to file a

8    motion for a lawyer.  If the judge gives me a lawyer,

9    I'll give it to him.

10   Q.    Is your brother currently deployed?

11   A.    No, he's teaching -- he's a professor now.

12   He got out and he's teaching college.

13   Q.    Which college?

14   A.    I don't know the name of it.  That's all,

15   too.

16   Q.    If I wanted to obtain sort of the information

17   that he's gathered, how would I get in touch with him?

18   A.    I wouldn't advise that, not with him.

19   Q.    Even if I wasn't going to --

20   A.    He's really pissed off about what happened.

21   Q.    Can you give me his contact information,

22   though?

23   A.    No, not without his consent.

24   Q.    Sergeant Antonio Baxter?

25   A.    Yes.

1   Q. And what about your mother, does she have any

2 documents that you intend to use?

3   A. Perhaps.

4   Q. And going back again to the documents that

5 your brother has, if this matter were to go to trial,

6 would you then ask him for those documents?

7   A. Absolutely, you'll get it.  Please don't

8 contact my family.  Because anything I'm going to use at

9 trial, I will submit it to you well ahead of trial.  And

10 you know, they are likely to be called as my witnesses.

11   Q. Who else?

12   A. I want to make it clear that Antonio Baxter

13 and Dorothy Baxter will perhaps be used as my witnesses.

14 So please don't --

15   Q. Is there anybody else that may be used as

16 your witnesses that you know of today?

17   A. Well, if I can figure out some of the people

18 who were there on the scene.  Who -- since you all are

19 claiming that Bracey jumped in later, I'm going to use

20 him.

21   Q. And we talked briefly way back at the

22 beginning if you had had any alcohol or drugs the

23 morning before this occurred.  What about in the 24

24 hours beforehand, if we widen --

25   A. Well, I don't know.  I think the night before

1    I had me a -- I had a half pint of E and J.

2         Q.    A half pint of E and J?

3         A.    (Nodding head.)

4         Q.    Anything else?

5         A.    No.  Smoked cigarettes, that's it.  Oh, it

6    could have been two nights before.  See, I don't

7    remember exactly.

8         Q.    Okay.  And other than your criminal history,

9    which we have documented, have you ever been involved in

10   a civil lawsuit other than this one?

11        A.    Yes, I have.

12        Q.    Can you tell me about those?

13        A.    I don't recall them all.

14        Q.    Were any of them in the last five years?

15        A.    No, not that I -- I don't think so, no.

16        Q.    Is there one in particular that you're

17   thinking may have been perhaps in the last five years?

18        A.    I don't recall.  That's my answer.  I can't

19   say for certain.  I don't think so.

20        Q.    Would you have been the plaintiff in those

21   cases or the defendant?

22        A.    The plaintiff.

23        Q.    Do you remember who those -- would those

24   lawsuits have been filed in Davidson County?

25        A.    Yes.  And for the record, I want to enter an

1     objection because any previous violence has nothing to

2     do with this case, with the officers letting that dog go

3     on me.  That has nothing to do with it, so my objection,

4     please.  Thank you.

5          Q.    Other than the Nashville General and the

6     Meharry bill, have you had to put out any money related

7     to the damages in this case?

8          A.    Other than buying pain medication for myself,

9     the answer to that question is no.

10         Q.    And you would have been buying pain

11    medication from either --

12         A.    The Commissary where they have been having me

13    locked up at.

14         Q.    Would that be --

15         A.    Oh, my back, too, got throwed out of place.

16    My back is hurting right now.

17         Q.    So your back got thrown out?

18         A.    Yeah.

19         Q.    Has a doctor diagnosed that?

20         A.    No, I haven't gone to the doctor about it.

21         Q.    Have you filled out like an injury form or

22    anything at either DCSO or here at a TDOC facility?

23         A.    I've got some documents that I filled out at

24    DCSO right here, yes.

25         Q.    And did those documents specifically note a

1  back injury?

2      A.    Well, I'll tell you what, when this thing

3  goes to trial, you will get everything I got, prior to

4  trial.

5      Q.    Mr. Baxter, again, because you are unfamiliar

6  with the rules of civil procedure, they actually require

7  that you disclose any documents prior to the discovery

8  cut-off, which for us is Friday.  Any documents that you

9  have in your possession or reasonably able to obtain.

10      A.    Well, I filed a motion for extension time of

11  discovery.  So that's not exactly relevant right now.

12      Q.    I'm saying the discovery cut-off is when we

13  would need to have all documents that you intend to rely

14  on at trial, whenever that may be.

15      A.    Wait a minute.  Hold on, the discovery cut-

16  off?

17      Q.    (Nodding head.)

18      A.    Heck, I'll give you my whole file.  I got

19  copies of the whole thing.  That's everything.

20      Q.    Okay.

21      A.    Come on now, ya'll got to have something to

22  smile about when you go to lunch today.

23      Q.    We do what can.

24      A.    Do not mess with my paperwork.  As hard as

25  I've worked on this case.  You know how hard it is to

1 respond to -- some of your stuff is 20 pages long.  I

2 got to respond.  I ain't that smart.

3     Q.   Did you obtain any sort of written or

4 recorded statements from anybody relating to this

5 lawsuit?

6     A.   I'm sorry?

7     Q.   Did you -- have you obtained any written or

8 recorded statements relating to this lawsuit?

9     A.   Okay, I don't understand the question.

10     Q.   Have you gotten a written statement from

11 somebody, sort of if there's a police officer that you

12 had talked to who said no, this is the version of events

13 and they wrote it out for you and gave it to you?

14     A.   My brother has talked to somebody.  I'm not

15 sure who it was.

16     Q.   Do you think your brother may have obtained

17 some sort of statement to help you?

18     A.   I don't know exactly what he has.  He don't

19 want to send it to the prison because he doesn't trust

20 prisons.

21     Q.   Do you expect to have an expert witness at

22 this trial, Mr. Baxter?

23     A.   I don't expect to right now, but that could

24 change especially when it comes to my mental health

25 issue.

1    Q.    Okay.

2    A.    I doubt it.

3    Q.    To the extent it does change, Mr. Baxter, can

4  we agree that you'll let me know?

5    A.    Oh, absolutely.

6    Q.    Thank you.  Did you file taxes in after 2010?

7    A.    I ain't filed taxes in so long.  I ain't had

8  any money to file taxes.

9    Q.    Okay.

10    A.    Yeah, I did file some taxes.  They took it

11  all because I owed child support.  I said I would never

12  file again.

13    Q.    How many children do you have?  I don't want

14  to know their names.

15    A.    Three.  Three beautiful children.

16    Q.    Are they all grown?

17    A.    All grown.  And they still love their daddy.

18    Q.    Do they all live in Nashville?

19    A.    Yes.

20    Q.    Do they all have different mothers?

21    A.    Every one of them.  That's awful, isn't it?

22  That's terrible, I know.  That's not nothing to be happy

23  about.

24    Q.    Mr. Baxter, were there any questions you

25  thought I was going to ask you today that I did not ask?

1    A.    You did a pretty dog gone thorough job, I

2    give it to you.  You're pretty good.

3    Q.    Well, this is the end of my questions.  I am

4    going to go and talk to the guard about giving you this.

5    The only two things I have handed you was this purple

6    pen and this piece of paper which I've gotten back.

7    A.    I want this on the record.  Regardless of the

8    outcome, right, you need to know as a Metropolitan

9    attorney that those officers, what they did, you know,

10   I've been arrested lots of times.  Right.  What those

11   officers did was sadistic, deliberate, malicious and now

12   all I see is an attempt to cover it up.  But they did

13   it.

14   Q.    I'm going to go ask about these medical

15   records.

16   A.    Is that on the record?

17   Q.    It is on the record, sir.

18   A.    Tell me something that is concerning me.

19   Anything that I am going to present at trial, I have to

20   present it before the discovery deadline?

21   Q.    Yes, sir.

22   A.    Okay.  I have no way of getting copies of all

23   of this.

24   Q.    Okay.  If it's a court filing, I don't need

25   that because I'll have gotten a copy already from being

1   on this case.

2        A.    But some of this stuff I want to present to

3   the jury.

4        Q.    Sure.  If it's something that I've sent you,

5   you don't need to send it back to me.  If it's something

6   that you have that you haven't filed with the Court and

7   that I don't have, then that you would need to send me.

8   The stuff that your brother has, that would need to be

9   sent to me.

10       A.    Anything that's been filed with the Court, I

11  don't have to send it?

12       Q.    You do not have to send it separately to me

13  if it's been filed with the Court.

14       A.    Okay.  Thank you.

15            MS. ROBERGE:  Sure.  And if you'll just wait

16  just a moment, and we'll get -- I want to make sure that

17  you don't get in trouble by me handing these to you and

18  that I don't get in trouble.

19            THE WITNESS:  I don't mind a pretty lady

20  handing me something.

21            FURTHER DEPONENT SAITH NOT.

22

23

24

25

1                        CERTIFICATE

2

STATE OF TENNESSEE        )

3                          )    SS.
COUNTY OF DAVIDSON        )

4

5          I, CAROLE K. BRIGGS, Licensed Court Reporter

6    within and for the State of Tennessee, do hereby certify

7    that the above deposition was reported by me and that

8    the foregoing pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills, and

10   ability.

11          I further certify that I am not a relative,

12   counsel or attorney of either party nor employed by any

13   of the parties in this case or otherwise interested in

14   the event of this action.

15          IN WITNESS WHEREOF, I have hereunto affixed my

16   official hand on this 19th day of September 2017.

17

18          *Carole K. Briggs*

19

20   _____

21   CAROLE K. BRIGGS

22   Shorthand Reporter

23   Tennessee License No. 345

24

25



Δ π EXHIBIT 1
Deponent Baxter
Date 9·13·17 Rptr CB
WWW.DEPOBOOK.COM

Back

Window

Window

Police Officer

Window

SIS
M

Front