# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | | |
|---|---|---|
| ALEXANDER L. BAXTER, | ) | |
| Plaintiff, | ) | No. 3:15-cv-19 |
| v. | ) | Judge Friedman |
| | ) | Magistrate Judge Frensley |
| SPENCER HARRIS, et al. | ) | JURY DEMAND |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS SPENCER HARRIS AND BRAD BRACEY'S MOTION FOR SUMMARY JUDGMENT

Alexander Baxter broke into an occupied home, looking for items to steal before proceeding to break into a car. A diligent neighbor observed Baxter's commission of these crimes and alerted the Metropolitan Nashville Police Department. MNPD responded by enabling aerial support and sending patrol officers to the area. In the face of this overwhelming police presence, Baxter fled and broke into another home to evade the police. Once the police confirmed the neighbor's account, they called for a K-9 unit because Baxter's actions constituted aggravated burglary. Officer Harris and Officer Bracey reported to the home Baxter holed up in. Both officers gave a warning that if Baxter did not surrender a K9 dog would be released. Irrationally, Baxter refused to surrender. Officer Harris, as K9 Iwo's handler, released the dog into the basement. After following in Iwo, Officers Harris and Bracey warily approached Baxter. After a fleeting moment, Officer Harris released Iwo to secure Baxter. At the time, Officer Bracey was positioned behind Baxter. Iwo bit Baxter once and secured him until Officer Bracey could place Baxter in handcuffs.

As a threshold matter, Officer Harris' actions did not constitute excessive force and no clearly established law holds that it does. Baxter's hidden position coupled with his erratic behavior in fleeing from the police when boxed in, and continued unwillingness to surrender knowing that a police dog would be released, would give a reasonably competent officer, like Officer Harris, the justified belief that Baxter posed a threat of safety to the officers. Therefore, he is entitled to qualified immunity.

With regard to Officer Bracey, he lacked any meaningful opportunity to intervene. Baxter's only support for his failure to intervene claim is that Officer Bracey and Officer Harris made eye contact in the seconds before Iwo was released. It is undisputed that Officer Harris did not say anything before releasing Iwo, Officer Bracey was located behind Baxter, and that Iwo will only respond to his handler and not to other police officers. Moreover, there are no cases that inform Officer Bracey of an affirmative duty to intervene in a canine apprehension under these circumstances. Officer Bracey is similarly entitled to qualified immunity.

Accordingly, Officer Harris and Officer Bracey motions for summary judgment should be granted and this case dismissed.

**FACTS**

On January 8, 2014, Baxter walked around "looking for something" because there were people who would buy laptops and other electronics from him. Baxter Deposition ("Baxter Depo.") at 15-16, attached to Motion as Exhibit 1. He would open doors and if they were unlocked he would run in, grab a few things, and run back out. *Id.* After breaking into a home on Portland Avenue, he stole some change, car keys and a bottle of liquor. *Id.* at 19. After observing Baxter enter the home a neighbor called the police. Declaration Spencer Harris ("Harris Dec") ¶

8, attached to Motion as Exhibit 2. While on the phone with the police, the neighbor saw Baxter leave the home and get into the car.

After seeing a police helicopter and a police car, Baxter knew the police were looking for him and he bolted from the car to a home he had previously broken into. Baxter Depo. at 20-21. While fleeing, he acknowledged that "it looked pretty bad." *Id.* at 23.

Once officers arrived on the scene they verified that Baxter had committed an aggravated burglary. Harris Dec. ¶ 8; *See* Tenn. Code Ann. § 39-14-402(defining aggravated burglary as burglary of a habitation). Given Baxter's actions in fleeing and the serious crime he had committed, the K-9 unit was called in to assist in apprehension. Harris Dec. ¶ 7-8.

The aviation unit tracked Baxter to a home on Fairfax Avenue, where Baxter jumped through a ground floor window that led to a basement. Baxter Depo. at 21-22. He immediately ran across the room to look out another window for police, but upon hearing the police radio he went to a defensive position between a chimney and a water heater. *Id.* at 25. While light was coming in through the windows, Baxter still described the basement as dark. *Id.* at 25-26; Harris Declaration ¶ 12.

Baxter saw a police officer look into the windows, but does not know if the officer saw him. Baxter Depo. at 27. Despite knowing police surrounded the home, hearing police officers call for his surrender, and knowing they intended to release a police dog, Baxter remained hidden and silent. *Id.* at 28-30.

Officer Bracey shouted a warning into the basement that a canine would be released. Harris Declaration ¶10-11. Officer Harris then echoed the warning. *Id.* After Baxter failed to

appear, Officer Harris released his K9 partner, Iwo[1]. *Id.* at ¶ 11; Baxter Depo. at 30. Iwo shadowed the path Baxter himself had previously taken. Baxter Depo. at 30.

Baxter then saw the two officers come around the water heater with Officer Harris eventually taking a position in front of him with Officer Bracey behind Baxter. *Id.* at 31-33.[2] Iwo came up to Officer Harris, who grabbed his chain while he reared up at Baxter. *Id.* at 34. For the next few moments, Officer Harris continued to shout at Baxter to put his hands up. *Id.* at 35-36. Baxter does not recall Officer Bracey saying anything; but, believes that Officer Bracey had a "sense" Officer Harris would let the dog go. *Id.* at 37. Seconds passed before Officer Harris released Iwo. *Id.* at 36. At no point did Officer Harris see that Baxter's hands were up. Harris Dec. ¶ 13. Baxter has never claimed that he told the Officers that he intended to surrender.

According to Baxter, Iwo lunged and bit him multiple times under his left arm pit. Baxter Depo. at 36, 39. Baxter's medical records reflect that he only received a single puncture wound. Nashville General Records, attached to Motion as Exhibit 3. Additionally, Iwo is trained to bite once then to maintain the bite until commanded to release. Iwo is trained to only respond to his handler, whether it be to release a bite or in any other scenario. Harris Decl. ¶ 6.

Officer Harris reached in and pulled Iwo off of Baxter. Baxter Depo. at 41. Baxter cannot recall if Officer Harris would have also given a verbal command to Iwo to release. *Id.* at 43. Once Baxter had been subdued, Officer Bracey placed handcuffs on Baxter and removed him from the basement.

---

[1] Iwo is a malinois police dog that has been certified since August 18, 2010. To become certified Iwo and Officer Harris completed 584 hours of training that included training on criminal apprehension. Thereafter, for five to ten hours each month, Iwo and Officer Harris completed additional training. Iwo will only respond to his handler and will not obey commands from any other person, including a police officer. Harris Dec. ¶ 4-5.
[2] For purposes of summary judgment only the Defendants adopt Baxter's facts as to what transpired in the basement.

# APPLICABLE STANDARDS

## I. Summary Judgment

Summary judgment is intended to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmovant must rebut such a showing by presenting sufficient evidence on which the jury could reasonably find for him; "[a] mere scintilla of evidence is insufficient" to meet this burden. *McLean v. 988011 Ontario, Ltd.,,* 224 F.3d 797, 800 (6th Cir. 2000). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *Id.*

## II. Qualified Immunity

Mr. Baxter bears the burden "prov[ing] two factors to show that [these] government official[s are] not entitled to qualified immunity from [t]his suit: (1) that the facts as alleged by him show a violation of a constitutional right; and (2) that such violated right was clearly established." *LeMarbe v. Wisneski*, 266 F.3d 429, 434 (6th Cir. 2001); *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). "Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caudill v. Hollen*, 431 F.3d 900, 911 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Rights at issue must be clearly established, not just in the abstract sense, but in a particularized sense." *Id*. In fact, the Supreme Court has noted that, although qualified immunity "**do[es] not require a case directly on point,**

**[ ] existing precedent must have placed the statutory or constitutional question beyond debate.**" *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011) (emphasis added).

The Supreme Court has "repeatedly told courts…not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd* at 2087. The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004)(per curium)(quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "it is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts." *Saucier* at 205.

Once an officer raises qualified immunity it is the plaintiff's burden to show that "no reasonable officer would have concluded, under the totality of the circumstances, that probable cause to arrest existed." *Province v. City of Detroit,* 12-1576, 2013 WL 3357994(6th Circuit July 5, 2013)(citing *Parsons v. City of Pontiac*, 533 F.3d 492, 500-501 (6th Circuit 2008).

## LEGAL ANALYSIS

**I.     Officer Harris**

An excessive force claim that arises in the context of an arrest is analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Fourth Amendment standard is objective, and it is applied without reference to the officer's subjective motivations. *Graham,* 490 U.S. at 397. The " 'proper application' of the reasonableness inquiry 'requires careful attention to the facts and circumstances of each particular case ....' " *St. John v. Hickey,* 411 F.3d 762, 771 (6th Cir.2005) (quoting *Graham,* 490 U.S. at 396). Factors to be considered in determining whether a use of

force was excessive include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. The standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer,* 310 F.3d 937, 944 (6th Cir.2002).

A court must recognize that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397. At the summary judgment stage of an excessive force claim, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record ... the reasonableness of [the defendant's] actions ... is a pure question of law." *Dunn v. Matata,* 549 F.3d 348, 353 (6th Cir.2008) (quoting *Scott,* 550 U.S. at 381 n. 8 (emphasis omitted).

Courts evaluate the use of a canine on a continuum. It is well established that when a suspect is presumed dangerous because of the crimes they have committed, or are acting irrationally, or are in a position to ambush police officers, and police officers give several warnings before deploying well trained canines, that the use of force is Constitutional. *Robinette v. Barnes,* 854 F.2d 909, 913-914 (6th Cir. 1988); *Matthews v. Jones,* 35 F.3d 1046, 1048 (6th Cir. 1994). On the opposite end of the spectrum are situations where an officer brings a poorly trained canine around an already subdued subject with no warning or uses a poorly trained canine to apprehend a non-violent suspect. *White v. Harmon,* 65 F.3d 169, 1995 WL 51886, at *3 (6th Cir.1995) (Table); *Campbell v. City of Springboro, Ohio,* 700 F.3d 779, 789 (6th Cir. 2012).

Here, Officer Harris's actions fall on the Constitutional portion of the spectrum. The police pursued Baxter as a suspect in an aggravated burglary when he began acting irrationally by refusing to surrender when he saw a police helicopter, multiple police cars, and knowing it "looked pretty bad." Also, Baxter cannot establish that Iwo lacked for training. Since being certified in 2010, Iwo completed monthly training achieving satisfactory scores each time. Harris Dec. ¶ 4-5. Before Officer Harris released Iwo into the basement, Baxter heard a warning being given. Inexplicably, Baxter continued to remain in his defensive position behind the water heater. Baxter's hidden position coupled with his erratic behavior in fleeing from the police when boxed in, and continued unwillingness to surrender knowing that a police dog would be released, would give a reasonable, competent officer, like Officer Harris, the justified belief that Baxter posed a threat of safety to the officers. *Robinette,* 854 F.2d at 913.

Despite Baxter's subjective belief that he surrendered, it is undisputed that at the time Officer Harris released Iwo, Baxter was not subdued, i.e. under police control. Until Iwo apprehended Baxter, he gave no indication that he intended to surrender to Officer Harris. Prior to Officer Harris being face to face with Baxter, he only displayed erratic behavior and a complete unwillingness to surrender. Given those circumstances Officer Harris and the rapidly evolving events, in the interest of his safety, could not take Baxter's apparent surrender at face value, particularly when it was unknown what weapons he possessed. *See Johnson v. Scott,* 576 F.3d 658, 660 (7th Cir. 2009)("no law that we know of required Scott to take Johnson's apparent surrender at face value, a split second after Johnson stopped running"); *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009)("it was objectively reasonable for Lister to question the sincerity of Crenshaw's attempt to [surrender] and use the canine to apprehend him. Lister was not required to risk his own life by revealing his position in an unfamiliar wooded area at night to

an armed fugitive who, up to that point, had shown anything but an intention of surrendering"); *Ingram v. Pavlak,* 2004 WL 1242761, at *5 (D.Minn. June 1, 2004)(officers reasonably could send a dog into a closet to flush out a suspect because, although the suspect said he was surrendering, he continued to hide in the closet, and the officers could not predict what he might do); *McAllister v. Dean,* 2015 WL 4647913, at *6 (E.D. Mo. Aug. 5, 2015)("defendants had no way of knowing how plaintiff was going to behave and they were not required to take his apparent surrender at face value, especially with a gun in easy reach"); *see also Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015)(deadly force justified after the suspect threw his gun away because the officer faced a rapidly escalating situation and only five seconds elapsed between when the suspect threw his gun away and when he was shot).

As stated above, canine cases are on a continuum. Officer Harris's conduct aligns with *Robinette* and *Matthews* that found use of a canine reasonable. The use of Iwo is distinguishable from cases at the other end of the spectrum when an un-trained canine bites a suspect already under police control. There is no case that would alert Officer Harris that his action in using Iwo to subdue an erratic, potentially threatening suspect, constituted excessive force. Moreover, the cases granting qualified immunity to the officer highlight the importance of facts establishing that a suspect has failed to surrender or has yet to be apprehended and has been given the opportunity to avoid an encounter with a dog before its employment. It is only when such facts have not been present; use of a police canine has been deemed unreasonable. *Rainey v. Patton,* 534 F. App'x 391, 397 (6th Cir. 2013). All of those facts are present in this case and are buttressed by the fact that Baxter committed a serious crime. Accordingly, Officer Harris is entitled to qualified immunity.

## II. Officer Bracey

An individual officer may be held liable for failure to prevent the use of excessive force where "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner,* 119 F.3d at 429. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir.2010).[3]

Baxter's own testimony establishes that when Officer Harris released the dog he did not communicate with Officer Bracey[4] – who stood behind Baxter – and that approximately 5 seconds elapsed between when Officer Harris had control of Iwo until he was released. This discrete fleeting moment denied Officer Bracey the opportunity to intervene. *Wells v. City of Dearborn Heights*, 538 F. Appx. 631, 640 (6th Cir. 2013)(the force to which Wells was subjected occurred at two discrete, fleeting points in time, the kneeing and the tasing, denying Ciochon and Pellerito the opportunity to intervene and prevent any harm).

Moreover, Iwo only responds to commands from Officer Harris. Harris Dec. ¶ 6. Once Iwo bit Baxter he had been trained to maintain the bite until Officer Harris commanded him to release. *Id.* at ¶ 15. And while Baxter states Iwo made two or three separate bites that pierced the skin (Baxter Depo. at 39), the medical records indicate that only one set of bite marks were found. (General Records). In other words, the medical records support that Iwo's technique

---

[3] As discussed above Officer Harris's action did not constitute excessive force and therefore there can be no failure to intervene.

[4] Baxter hypothesizes that the two Officers communicated through eye contact in the five seconds before Officer Harris released Iwo. Given that Baxter maintains that the Officers stood in front of and behind him, it is a physical impossibility for him to have observed any alleged eye contact. Moreover, no court has ever equated momentary eye contact with a meaningful opportunity to intervene.

conformed to his training and that Officer Bracey lacked any opportunity to either stop Iwo's apprehension or to remove Iwo prior to Officer Harris giving the command to release.

In similar circumstances, albeit not a canine case, the Sixth Circuit refused to hold an officer and nurse liable for a failure to intervene. In *Burgess v. Fisher,* while at the jail the plaintiff was taken down after mouthing off to corrections officers in a process that took approximately ten seconds. 735 F.3d 462, 470 (6th Cir. 2013). Another corrections officer and the nurse observed the takedown and plaintiff alleged they had failed to intervene. *Id.* at 476. In upholding the grant of summary judgment, the Court cited the defendants' lack of anticipation of the takedown and the duration of the takedown being ten seconds. Accordingly, the Court held there was not enough time for them to both perceive the incident and then intervene. *Id.* at 476.

Similarly, this Court should grant Officer Bracey summary judgment because the same factors are present. Baxter testified that Officer Harris did not say anything immediately before releasing Iwo; therefore, Officer Bracey could not have told him to stop. Nothing in the record establishes that Officer Bracey should have anticipated the release of Iwo. Similarly, because Officer Bracey stood behind Baxter he could not somehow restrain Iwo before he bit Baxter. To do so would require almost super human reflexes, first to predict Officer Harris's actions, and second to get around Baxter and in a position to restrain Iwo without putting himself in danger of being bit all within less than 5 seconds. *See Ontha v. Rutherford Cnty., Tenn.,* 222 Fed.Appx. 498, 506 (6th Cir.2007) (finding that six or seven seconds was insufficient time to compel intervention).

Additionally, counsel has located no authority from the United States Supreme Court, the United States Court of Appeals for the Sixth Circuit, or district courts within the Sixth Circuit addressing the issue of what duty an officer owes to stop the release of another officer's K-9.

And the case most closely on point, *Dickinson v. City of Kent,* 2007 WL 1830744, at *1 (W.D. Wash. June 25, 2007), where the District Court for the Western District of Washington granted qualified immunity to the defendant officers on a failure to intervene claim involving the use of a K-9 because they were not involved in the decision to use the K-9 and, after the K-9 had been deployed, they had no opportunity to recall him, supports Officer Bracey's position. This singular district court case does not "place the constitutional question beyond debate" and could not have placed Officer Bracey on notice that his actions were unconstitutional.

Indeed, the opposite is true. The case at bar mirrors those facts in *Dickinson* with regard to Officer Bracey's opportunity to intervene. No facts are present that would suggest Officer Bracey had any involvement in the decision to release Iwo. Officer Harris, the officer in front of Baxter, had control of Iwo and Iwo only responds to commands from his handler. Only at the highest levels of speculation could be it said that Officer Bracey had the opportunity to intervene in these circumstances, accordingly he is entitled to summary judgment.

Respectfully submitted,

THE DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
JON COOPER (#23571)
DIRECTOR OF LAW


/s/Melissa Roberge
Keli J. Oliver (#21023)
Melissa Roberge (#26230)
Assistant Metropolitan Attorneys
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341
*Counsel for Spencer Harris and Brad Bracey*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was delivered via U.S. Mail to the following:

Alexander Baxter
TDOC #145056
140 Macon Way
Hartsville, Tennessee 37074


on the 13th day of October, 2017.

                                              /s/Melissa Roberge
                                              Melissa Roberge